THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JIMMY MITCHELL, Defendant-Appellant.

(No. 56969;

First District (1st Division)—November 17, 1975.

James J. Doherty, Public Defender, of Chicago (James N. Gramenos, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and John T. Theis, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE EGAN delivered the opinion of the court:

Before trial on a charge of rape, a motion to suppress identification was filed and denied. After the jury was impaneled, the defendant, Jimmy Mitchell, told the judge that he wished to represent himself. After a lengthy admonition to the defendant, who persisted in his request, the judge permitted the public defender to withdraw. The public defender advised the judge that he would remain in the courtroom. The defendant was found guilty by a jury and sentenced to a term of 4 to 12 years.

On October 22, 1970, at about 8:20 p.m., the complainant got off a bus at 69th and Jeffery in Chicago on her way home from school and

walked toward her residence four blocks away. She was accosted by a man who, the evidence shows, ripped off her clothes, raped her and forced her to perform an act of oral sex. The acts took place across the street from her home. The lighting conditions were good where she was first seized and where she was subsequently carried. Illumination was provided by street lights and lights from the houses in the area. She saw her assailant for a total of 20 minutes and was in close proximity to him for 15 minutes while he performed the sex acts. During that time she never lost sight of his face. After the man left, she ran across the street to her residence at Gateway House, 6909 South Cregier, a rehabilitation center for ex-drug users, where she made an immediate complaint to Eudell Sullivan, the coordinator at the center. The police were called.

Police Officer Garth Angel, who responded to the call saw the complainant, whom he described as incoherent and "in a state of shock," lying on a couch. He went outside and saw her books sprawled on the ground where she had been first seized. He found no evidence at the place where she had been raped. He took her to Billings Hospital where an examination revealed the presence of live spermatozoa. She was later shown police photographs and sent home.

She testified that she described her assailant as a man with medium brown skin, 5 feet, 8 inches tall, 150 pounds, wearing green work clothes and heavy shoes, with a natural hairstyle and a beard. Officer Angel testified that she described the man as Negro, 6 feet tall, 175 pounds, 32 to 34 years old, with an Afro hairstyle, sideburns and a beard, and wearing green work clothes. His police report indicated that she described her assailant's age as 36 to 38 years of age. The defendant was 26 at the time of the crime.

On October 26, Officer Manella showed the complainant approximately 250 photographs, one of which she picked out. Although it is not specifically stated in the record, she apparently selected the defendant's photograph.

Police Officer Beilke arrested the defendant on November 7 and took him to the police station, but Officer Manella was unable to contact the complainant so that she could view the defendant. The police took a photograph of the defendant and released him. On cross-examination, Officer Manella denied telling the defendant that the complainant said that he was not the person.

On November 11, the defendant was again arrested. The complainant was brought to the police station and observed the defendant standing alone. She identified him as the man who had raped her. She testified that she had positively identified the defendant at the station and had

never told the police that the defendant was not the man who had attacked her.

The defendant testified that at the time of the ocurrence he had been employed as a laborer at Goldblatt's department store for three months. On the day of the crime he worked until 6 p.m. He could not recall what he did after work that particular day; but he related what he customarily did: He usually washed and had a cup of coffee which took about 30 minutes; then he went home on the El which took about 35 minutes; sometimes he stopped for a cup of coffee or a beer before walking home; then he would study in preparation for college entrance examinations until about 10 p.m.; at about that time, he would take a break and go to bed. He never wore green pants, only black pants, and he did not wear a work uniform.

He also testified that he was first arrested on November 7 and that he was viewed by two women, one of whom was the complainant. After a show-up, his picture was taken and one of the police officers said that the woman was unable to identify him. Consequently, he was released. The defendant said that he was arrested again on November 11 and again viewed by the complainant. This time the police officer said that she had identified him.

At the conference on instructions, the assistant public defender who had previously represented the defendant told the trial judge that he had recently talked to Officer Beilke and that Beilke said that the defendant was viewed by "a young woman and an older woman" in connection with another case on November 7. The public defender suggested that the jury be told that the defendant was in fact viewed by two women on November 7, as Mitchell had insisted, but that Mitchell was mistaken in his belief that the complainant was one of the women. The public defender also said that the jury would regard Mitchell as a "madman" unless the source of the defendant's confusion was disclosed. The trial judge and the assistant state's attorney refused to inform the jury of these facts.

■■ The defendant now contends that the prosecutors knew that the defendant had been viewed by two women on November 7 and that the prosecutors suppressed this information. To begin with, we are not required to accept the assertion now made by the defendant's appellate attorney that the defendant was not present at the conference on instructions. The record shows that the defendant was present in open court on November 2, 1971, at 9:30 a.m. when the clerk called the case. The court reporter then noted that the proceedings that followed were heard out of the presence of the jury, apparently in the judge's chambers.

The court said:

"Mr. Court Reporter, we have sat in here and Mr. Romano [assistant state's attorney] has submitted about 12 or 13 instructions that are all stock IPI.

When Mr. Mitchell came in he said he didn't want to look at the stuff; didn't need it—whatever the exact words. I said you may keep it or not, as you wish."

The court then noted that Mr. Scheffler, the assistant public defender, had submitted an instruction on behalf of the defendant and that the court would give the instruction. Then followed colloquy between Mr. Scheffler, the court, and the assistant state's attorney. At that time Mr. Scheffler informed the court of his conversation with Officer Beilke. It is significant that the court noted that the defendant "came in," indicating to us that he came into the judge's chambers. While the record does not specifically place him present in the judge's chambers, it is unreasonable to assume that the court would proceed in his absence. Based on the record before us, we judge that it is more reasonable to infer his presence at the conference on instructions. Similarly, even accepting the defendant's absence from the conference on instructions, it is unreasonable to assume that Scheffler, who remained in the courtroom and who actively participated to the extent that he submitted an instruction on behalf of the defendant, did not also inform the defendant of his conversation with Beilke.

■■ The prosecutors were right in their contention that proof that other witnesses to other crimes did not identify the defendant is not as a general rule admissible. But under the peculiar circumstances of this case, such evidence would have been admissible in order to correct any inadvertent error. Yet the defendant himself took no steps to correct any possible misunderstanding. To the contrary, in his closing argument after the proceedings in chambers he persisted in telling the jury that the complainant had seen him in the station on November 7 and that she had told the police that he was not the man who had raped her.

■■ Moreover, there was no suppression of any evidence. The complainant testified in rebuttal that she was in St. Louis on November 7. Beilke also testified in rebuttal and said that the defendant was arrested on November 7 and released. The record shows that the defendant had all the police reports when he cross-examined Beilke, and knew as much as the prosecutors did. During that cross-examination, the following occurred:

"Q. Do you recall the complainant coming down, her?
A. Her?
Q. Yes.
A. No. She didn't come down there.

Q. She did not come down there?

A. No, *not her.*" (Emphasis supplied.)

The defendant obviously had every opportunity to ask Beilke whether or not any other women viewed him. He chose not to do so. For these reasons we deem that the State did not suppress any information from the defendant.

One other observation is appropriate. The entire defense hinged, in addition to the defendant's denial, on his testimony that the complainant had seen him on two occasions and on the first occasion she was unable to identify him. From a defense tactical standpoint, the introduction of evidence that women other than the complainant had viewed the defendant on November 7 would have dealt his credibility a severe blow. It is reasonable to assume that his failure to call Beilke was the result of a calculated decision on his part.

The defendant was indicted on December 14, 1970, and two continuances were granted on his motion. On February 10, 1971, he was arraigned. The defendant appeared *pro se* and asked the trial court to appoint counsel since he did not have sufficient funds to employ private counsel. The trial judge apparently felt that the defendant did have sufficient funds and refused to appoint counsel. The defendant pleaded not guilty and the case was assigned for trial to another judge. On May 27, 1971, that judge appointed a public defender to represent the defendant. On June 22, 1971, the assistant public defender filed discovery motions and a request for a list of witnesses. The defendant's case was continued from time to time. The defendant now contends that the failure to provide the defendant with early appointment of counsel deprived him of effective assistance of counsel.

██ A defendant charged with a felony has the right to be represented by counsel at the arraignment, a critical stage of the case. (*People v. Hessenauer*, 45 Ill.2d 63, 67-68, 256 N.E.2d 791.) Under Supreme Court Rule 401(a)(3) (Ill. Rev. Stat. 1971, ch. 110A, par. 401(a)(3)) and Illinois Revised Statutes 1971, ch. 38, par. 113—3(b), a defendant who is indigent is entitled to have counsel appointed by the court. However, the absence of counsel at the arraignment proceeding cannot be the basis for reversal where no prejudice to the defendant resulted. *People v. Rebenstorf*, 37 Ill.2d 572, 229 N.E.2d 483, *cert. denied*, 390 U.S. 924, 19 L.Ed.2d 984, 88 S.Ct. 853; *People v. Taylor*, 32 Ill.2d 165, 204 N.E.2d 734.

██ The defendant pleaded not guilty at his arraignment. The public defender was appointed five months before trial. He filed a motion for discovery and, later, a motion to suppress identification testimony. The record reflects that the public defender had the police reports and grand jury testimony before trial. The case was factually simple. The only wit-

nesses for the prosecution were the complainant, the examining doctor and several police officers. The motion to suppress the identification of the complainant was competently handled by the assistant public defender. Essentially, the credibility of the witnesses was the essence of the defense; and there is no evidence that the defendant's ability to prepare for trial was impaired by the delay in appointment of counsel.

██ The defendant next asigns as error the trial court's denial of the motion to suppress the in-court identification testimony. The basis of the claim are the facts that the complainant was shown a photograph of the defendant and then identified him after viewing him in a one-on-one confrontation. "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a line-up, has been widely condemned." (*Stovall v. Denno*, 388 U.S. 293, 302, 18 L.Ed.2d 1199, 87 S.Ct. 1967); but not every viewing of a suspect alone will be considered a denial of due process if there are justifying or saving circumstances. *People v. Blumenshine*, 42 Ill.2d 508, 512, 250 N.E.2d 152.

The burden is on the defendant to show that the confrontation conducted was unnecessarily suggestive and conducive to irreparable mistaken identification. (*People v. Blumenshine*, 42 Ill.2d 508, 250 N.E.2d 152.) According to Officer Manella, a full line-up was impossible due to the unavailability of similarly bearded men. The complainant had observed the defendant for 20 minutes. For 15 minutes she was in close proximity to him, never losing sight of his face. The lighting conditions where she was first seized and where she was carried were good.

██ It is clear that the courtroom identification of the defendant by the complainant was based not on the one-on-one show-up but on her observation of him on October 22. Under these circumstances we are satisfied that the courtroom identification was based on an observation of independent origin and not on any improper pre-trial confrontation. See *People v. Winfrey*, 11 Ill.App.3d 164, 298 N.E.2d 413.

██ The defendant next contends that reversible error occurred when the complainant and Officer Manella testified that she viewed photographs from two albums and picked out the defendant's picture. This, the defendant urges, was to suggest to the jury that the defendant had a prior arrest and conviction record. Utilization of photographs in the identification procedure is a proper method of police investigation (*Simmons v. United States*, 390 U.S. 377, 384-385, 19 L.Ed.2d 1247, 88 S.Ct. 967); and use of police photographs for identification purposes has long been upheld. (*People v. Maffioli*, 406 Ill. 315, 94 N.E.2d 191; *People v. Purnell*, 105 Ill.App.2d 419, 245 N.E.2d 635; *People v. Adams*, 22 Ill.App.3d 665, 318 N.E.2d 278.) We judge, therefore, that testimony concerning police photographs was not error. Moreover, the record shows

that the defendant, in his opening statement, first brought out the matter of police photographs to the attention of the jury:

"THE DEFENDANT: I asked them, 'How did I become suspicious? How did I become a suspect?' So he said she picked my picture out of a book. Now, they do have my picture down there because of the fact about four years ago I was charged—

ASSISTANT STATE'S ATTORNEY: I object to this as not being part of an opening statement."

Last, the defendant failed to object to the admission of the testimony concerning police photographs and thereby waived any error. (*People v. Killebrew*, 55 Ill.2d 337, 303 N.E.2d 377.) We adhere to the waiver rule even though the defendant conducted his own defense. See *People v. Richardson*, 17 Ill.2d 253, 161 N.E.2d 268.

■■ We do not believe that the defendant may complain of Officer Manella's testimony that the complainant viewed 250 photographs in two books and picked out the defendant's picture. She had already testified that she had picked out his picture. (See *People v. Keller*, 128 Ill.App.2d 401, 263 N.E.2d 127.) That is the essential difference between this case and *People v. Ford*, 21 Ill.App.3d 242, 315 N.E.2d 87, cited by the defendant, in which the complaining witness did not testify to a pre-trial selection of the defendant's picture but a police officer did. Further, the defendant did not object to Officer Manella's testimony. *People v. Williams*, 117 Ill.App.2d 34, 254 N.E.2d 81.

■■ The defendant also contends that his identification should have been suppressed because he was arrested without a warrant. He does not dispute the fact that the police officers had probable cause to arrest him. He does assert that, having reasonable grounds to believe that the defendant committed a crime, the police were constitutionally mandated to obtain a warrant since it was practicable for them to do so. A similar argument was rejected in *People v. Jones*, 38 Ill.2d 427, 434, 231 N.E.2d 580. See also *People v. Taylor*, 58 Ill.2d 69, 317 N.E.2d 97; *People v. Johnson*, 45 Ill.2d 283, 259 N.E.2d 57, *cert. denied*, 407 U.S. 914, 32 L.Ed.2d 689, 92 S.Ct. 2334. By responding to the defendant's argument, we do not mean to say that an illegal arrest *ipso facto* vitiates a subsequent identification.

■■ The defendant next argues that the trial court erred in giving a certain instruction. Since he has failed to set out in the abstract all of the instructions tendered in addition to the disputed ones, he has not preserved the alleged error for review. (*People v. Brown*, 25 Ill.2d 423, 427, 185 N.E.2d 161; *People v. Brown*, 3 Ill.App.3d 796, 798, 278 N.E.2d 556.) The public defender who had been appointed to represent the defendant and who had withdrawn from the case, assisted the defendant

in the instruction phase and submitted an instruction on the defendant's behalf. Neither the public defender nor the defendant raised an objection to the instruction in question. The failure to object to a proposed instruction waives the alleged error except that substantial defects are not waived where the interests of justice so require. (Ill. Rev. Stat. 1971, ch. 110A, par. 451(c); *People v. Robinson*, 21 Ill.App.3d 343, 350, 315 N.E.2d 95.) The instruction in question is that which provides that an attorney has a right to interview a witness. There was nothing in the record to support the instruction and it was therefore objectionable; but it was not an instruction the giving of which would have any appreciable effect on the jury's verdict. Therefore, the giving of the instruction was not such a substantial defect as contemplated by the Rule.

The defendant also claims that he was denied a fair trial by the remarks made by the prosecutor in closing argument. Again, the defendant failed to object to any of the comments and thus waives the error. (*People v. Pearson*, 52 Ill.2d 260, 269, 287 N.E.2d 715.) But if the improper remarks may materially affect the outcome of the case they will be considered even where no timely objection has been made. (*People v. Dukett*, 56 Ill.2d 432, 443, 308 N.E.2d 590, *cert. denied*, 419 U.S. 965, 42 L.Ed.2d 180, 95 S.Ct. 226.) We have examined the remarks of the prosecutor and judge, they were fair comments based on legitimate inferences from the evidence.

■■ At one point the prosecutor said that the defendant had given the jury "an alibi that amounts to a smoke screen." Another time the prosecutor said that there was one bit of evidence, the testimony of the complainant, that "had been perhaps hidden in closing argument, when the defendant started a big smoke screen about police procedures and big conspiracy against him." The defendant's closing argument consisted primarily of a repetition of his trial testimony. In addition, he described to the jury what had happened at the preliminary hearing. He also said that the police officers were both lying; that perhaps the police destroyed the original reports and that the reports in court were "phony"; that the assistant state's attorney at the preliminary hearing thought that the complainant was lying and that the defendant was innocent. We believe the remarks of the prosecutor were justified. The case cited by the defendant, *People v. Burnett*, 27 Ill.2d 510, 190 N.E.2d 338, is inapposite. In that case the prosecutor accused the defense attorney of attempting to "fool the jury" to "turn loose a cold-blooded murderer upon the streets." The Supreme Court, while affirming the conviction, said (27 Ill.2d at 518):

"We cannot condone these personal attacks upon defense counsel and consider them unprofessional and highly improper."

In this case, the defendant was both a witness and his own attorney. We deem the remarks were directed to his assertions of fact in his closing argument.

Finally, the defendant contends that he was not proved guilty beyond a reasonable doubt. He first argues that his conviction should be reversed because it is based, in part, on the testimony of an ex-drug user. The complainant testified that she had formerly used marijuana. She was living at Gateway House, a re-educational program for ex-drug users. She also stated that she had never taken any other narcotics. Eudell Sullivan, the coordinator of Gateway House, testified that he had known the complainant since she joined the program and that she had used drugs but was not a narcotics addict. He also said that she had worked her way through to the second phase of the program and, therefore, was considered responsible enough to go out into the community.

■■ The credibility of a witness is a matter for the trier of fact to determine, and a conviction will not be reversed unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Booth,* 20 Ill.App.3d 88, 92, 312 N.E.2d 736.) The possibility that the complainant may have been a narcotics addict is an important factor in determining the credibility of a witness. However, even if it was shown that the complainant was in fact using drugs, this consideration alone will not destroy a witness' credibility. (*People v. Gilford,* 17 Ill.App.3d 131, 133, 308 N.E.2d 55.) There was no evidence that the complainant used drugs or narcotics at the time of the crime or at the time she testified. She had been examined by a doctor shortly after the occurrence; and there was no indication by the doctor that she was under the influence of drugs at the time of the examination. Both the complainant and Eudell Sullivan testified that she was not using drugs at the time of the crime or the time of the trial. The fact that the complainant had used drugs a year and one-half before the crime is insufficient to adversely affect her credibility.

■■ The decisive evidence in this case was the in-court identification of the defendant. The testimony of one witness is sufficient to convict even though the testimony is contradicted by the accused, as long as the witness was credible and circumstances under which the witness viewed the accused would permit a positive identification. (*People v. Stringer,* 52 Ill.2d 564, 569, 289 N.E.2d 631; *People v. Nichols,* 27 Ill.App.3d 372, 378, 327 N.E.2d 186.) We have already detailed the

complainant's testimony; and it is unnecessary to repeat it all. Suffice it to say that the opportunity for her identification and her identification in court provided proof of guilt beyond a reasonable doubt. The only discrepancy which the defendant points out in her description is that she described her assailant as 36 to 38 years old, whereas the defendant was about 26 years old at the time of the crime. Precise accuracy in the description of the physical characteristics of the accused is not essential where the identification of the defendant is positive. *People v. Perry*, 21 Ill.App.3d 18, 315 N.E.2d 173.

As noted previously, there was a disparity between the testimony of Officer Angel and the complainant regarding some details in the description she gave the police. We note that the circumstances surrounding the complainant's first description presented a great possibility of inaccuracy. At the time she first gave the description to the police, she was lying down on a couch and told the police that her assailant was about the size of her boyfriend who was standing up. The evidence indicates that the complainant gave the description to Officer Angel when she was either incoherent or just regaining her composure; and she described the size of the man by comparison with her boyfriend. Thus, her description to Officer Angel was given under conditions which made precision unlikely, if not impossible. Other inconsistencies in the complainant's testimony, which the defendant has pointed out, are minor in nature and are insufficient to render the complainant's testimony improbable. The judgment of the circuit court is affirmed.

Judgment affirmed.

BURKE, P. J., and GOLDBERG, J., concur.